**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **DAVID E. PENA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | **SA-06-CA-0547 RF (NN)** |
| **Commissioner of the Social** | § | |
| **Security Administration,** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

**TO:   Hon. Royal Furgeson**
        **United States District Judge**

**I. Introduction**

Plaintiff David Pena seeks reversal of the decision by the Administrative Law Judge

(ALJ) to award him Supplemental Security Income (SSI) based on an onset date of January 20,

1999. Mr. Pena contends that he was disabled beginning on February 1, 1997. Mr. Pena seeks

to have the decision of the defendant, the Commissioner of the Social Security Administration

(SSA), denying him SSI and Disability Insurance Benefits (DIB) for the time period February 1,

1997 to January 19, 1999 reversed. After considering Mr. Pena's brief in support of his

complaint,[1] the brief in support of the Commissioner's decision,[2] Mr. Pena's reply brief,[3] the

_____

[1] Docket entry # 17.

[2] Docket entry # 23.

[3] Docket entry # 22.

record of the SSA proceedings, the pleadings on file, the applicable case authority and relevant statutory and regulatory provisions, and the entire record in this matter, I recommend affirming the Commissioner's decision.

I have jurisdiction to enter this Memorandum and Recommendation under 28 U.S.C. § 636(b) and this district's general order, dated July 17, 1981, referring all cases where a plaintiff seeks review of the Commissioner's denial of the plaintiff's applications for benefits for disposition by recommendation.[4]

## II. Jurisdiction

The District Court has jurisdiction to review the Commissioner's final decision as provided by 42 U.S.C. §§ 405(g), 1383(c)(3).

## III. Administrative Proceedings

Based on the record in this case, Mr. Pena fully exhausted his administrative remedies prior to filing this action in federal court.  Mr. Pena applied for DIB and SSI on Nov. 13, 1998, alleging disability beginning February 1, 1997.[5]  The Commissioner denied the application initially and on reconsideration.[6]  Mr. Pena then asked for a hearing before the ALJ.[7]  A hearing was held before the ALJ on February 7, 2000.[8]  The ALJ issued a decision on March 31, 2000, concluding that Mr. Pena had been disabled since January 20, 1999 when a liver biopsy showed

---

[4]*See* Local Rules for the Western District of Texas, appx. C, p. 10.

[5]SSA record, p. 86.

[6]*Id*. at pp. 2, 46 & 53.

[7]*Id*. at p. 57.

[8]*Id*. at p. 640.

fairly advanced liver disease.[9]   The ALJ determined that prior to that time, Mr. Pena had the residual functional capacity to perform light work.  Dissatisfied with that determination, Mr. Pena asked for review of the ALJ's decision.[10]   On July 24, 2000, the SSA Appeals Council vacated the ALJ's decision and remanded Mr. Pena's case because the ALJ's decision did not address (1) the severity of Mr. Pena's diabetes, hypertension and obesity; (2) Mr. Pena's mental impairments; or (3) Mr. Pena's alcohol abuse.[11]   The ALJ conducted a second hearing on October 8, 2003.[12]   The ALJ issued a second opinion on August 25, 2004, again concluding that Mr. Pena was not disabled prior to January 20, 1999.[13]   Mr. Pena asked for review of that decision to challenge the onset date.[14]   On May 24, 2006, the Appeals Council concluded that no basis existed for review of the ALJ's decision.[15]   The ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g).  On March 28, 2006, Mr. Pena filed this action seeking review of the Commissioner's decision, complaining that substantial evidence exists to show that he was disabled prior to January 19, 1999.[16]

---

[9]*Id*. at pp. 38-44.

[10]*Id*. at p. 71.

[11]*Id*. at p. 74.

[12]*Id*. at p. 598.

[13]*Id.* at p. 19.

[14]*Id*. at p. 18.

[15]*Id*. at p. 4.

[16]*See* Mr. Pena's complaint, docket entry # 1.

## IV.  Issue Presented

Is the ALJ's decision that Mr. Pena was not under a "disability," as defined by the Act, at any time prior to January 19, 1999 supported by substantial evidence and does the decision comport with relevant legal standards?

## V.  Analysis

### A. Standard of Review

In reviewing the Commissioner's decision denying disability benefits, the reviewing court is limited to determining whether substantial evidence supports the decision and whether the Commissioner applied the proper legal standards in evaluating the evidence.[17]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[18]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[19]

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[20]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from reweighing the evidence or substituting its

---

[17]*Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995); 42 U.S.C. §§ 405(g), 1383(c)(3).

[18]*Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

[19]*Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988) (quoting *Hames*, 707 F.2d at 164).

[20]*Martinez*, 64 F.3d at 173.

judgment for that of the Commissioner.[21]   Conflicts in the evidence and credibility assessments are for the Commissioner and not for the courts to resolve.[22]   Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[23]

### 1. Entitlement to Benefits

Every individual who meets certain income and resource requirements, has filed an application for benefits, and is under a disability, is eligible to receive benefits.[24]   The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[25]   A claimant shall be determined to be disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy,

---

[21]*Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see also Villa*, 895 F.2d at 1021 (The court is not to reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.).

[22]*Martinez*, 64 F.3d at 174.

[23]*Id*.

[24]42 U.S.C. § 1382(a)(1) & (2).

[25]42 U.S.C. § 1382c(a)(3)(A).

regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[26]

### 2. Evaluation Process and Burden of Proof

Regulations set forth by the Commissioner prescribe that disability claims are to be evaluated according to a five-step process.[27]  A finding that a claimant is disabled or not disabled at any point in the process is conclusive and terminates the Commissioner's analysis.[28]

The first step involves determining whether the claimant is currently engaged in substantial gainful activity.[29]  If so, the claimant will be found not disabled regardless of his medical condition or his age, education, or work experience.[30]  The second step involves determining whether the claimant's impairment is severe.[31]  If it is not severe, the claimant is deemed not disabled.[32]  In the third step, the Commissioner compares the severe impairment with those on a list of specific impairments.[33]  If it meets or equals a listed impairment, the claimant is deemed disabled without considering his age, education, or work experience.[34]  If the impairment

---

[26]42 U.S.C. § 1382c(a)(3)(B).

[27]20 C.F.R. §§ 404.1520 and 416.920.

[28]*Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

[29]20 C.F.R. §§ 404.1520 and 416.920.

[30]*Id.*

[31]*Id.*

[32]*Id.*

[33]*Id.*

[34]*Id.*

is not on the list, the Commissioner, in the fourth step, reviews the claimant's residual functional capacity and the demands of his past work.[35]  If the claimant is still able to do his past work, the claimant is not disabled.[36]  If the claimant cannot perform his past work, the Commissioner moves to the fifth and final step of evaluating the claimant's ability, given his residual capacities, age, education, and work experience, to do other work.[37]  If the claimant cannot do other work, he will be found disabled.  The claimant bears the burden of proof at the first four steps of the sequential analysis.[38]  Once the claimant has shown that he is unable to perform his or her previous work, the burden shifts to the Commissioner to show that there is other substantial gainful employment available that the claimant is not only physically able to perform, but also, taking into account his exertional and nonexertional limitations, able to maintain for a significant period of time.[39]  If the Commissioner adequately points to potential alternative employment, the burden shifts back to the claimant to prove that he is unable to perform the alternative work.[40]

## B. Findings and Conclusions of the ALJ

In the instant case, the ALJ reached his decision at step five of the evaluation process.  At step one, the ALJ determined that Mr. Pena had not engaged in substantial gainful activity since

---

[35]*Id.*

[36]*Id.*

[37]*Id.*

[38]*Leggett*, 67 F.3d at 564.

[39]*Watson  v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002).

[40]*Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989).

7

his alleged onset date.[41]  At step two, the ALJ determined that Mr. Pena's chronic liver disease

with liver transplant, diabetes mellitus with renal insufficiency, degenerative arthritis, obesity,

hypertension, adjustment disorder, and learning disorder were medically determinable

impairments.[42]  The ALJ characterized these impairments as severe.[43]  At step three, the ALJ

found that Mr. Pena had a liver biopsy on January 20, 1999 that showed significant liver disease.

Because section 5.05(F)(3) of the Commissioner's Listing of Impairments provides that a person

is disabled if he has confirmed liver disease by liver biopsy showing "[h]epatic cell necrosis or

inflammation, persisting for at least 3 months, documented by repeated abnormalities of

prothrombin time and enzymes indicative of hepatic dysfunction,"[44] the ALJ determined that Mr.

Pena was disabled beginning January 20, 1999.  The ALJ also determined that Mr. Pena ceased

being disabled under section 5.05(F)(3) when he had a liver transplant on May 20,

2002—because he no longer had chronic liver disease—but determined that Mr. Pena was

disabled under section 5.09 because that section provides that a person is to be considered

disabled for 12 months after a liver transplant.  The ALJ determined that Mr. Pena's other

impairments did not meet a listing.  The ALJ found no evidence showing a severe impairment

prior to January 20, 1999 and prior to the expiration of Mr. Pena's insured status for DIB on June

30, 1997.[45]  At step four, the ALJ found that during the time period February 1, 1997—Mr.

---

[41]SSA record, pp. 24 & 29.

[42]*Id.*

[43]*Id.*

[44]20 C.F.R. pt. 404, subpt. P., app. 1, § 5.03(F)(3).

[45]SSA record, pp. 27 & 29.

Pena's alleged onset date—and January 19, 1999—the day before the liver biopsy was performed—Mr. Pena had the residual functional capacity to perform light work, lifting and carrying up to 20 pounds occasionally and 10 pounds frequently; walking/standing up to 6 hours of a workday with normal breaks; sitting up to 6 hours of a workday with normal breaks; and performing work involving only simple, repetitive tasks.[46]  The ALJ also determined that Mr. Pena lacked the residual functional capacity to perform the requirements of his past work, but determined in step five that significant numbers of jobs exist in the economy that Mr. Pena could have performed during the time period February 1, 1997 to January 19, 1999.  Thus, the ALJ concluded that Mr. Pena was not disabled as defined in the Social Security Act during that time period.[47]

## C.  Mr. Pena's Allegations of Error

Mr. Pena claims that the ALJ erred by: (1) failing to find that he is illiterate, (2) finding that he had the residual functional capacity to perform light work prior to January 20, 1999, and (3) misapplying the residual functional capacity grid rules.  Mr. Pena maintains that substantial evidence shows that he was disabled during the time period February 1, 1997 to January 19, 1999.  Although the record in this case consists of 660 pages, no medical evidence shows that Mr. Pena was disabled during that time period.  The only evidence that suggests that Mr. Pena was limited in his ability to work is his wife's testimony that he was unable to work beginning in 1997.  Mrs. Pena's opinion is not supported by any medical evidence.

Viewed as a whole, the medical record shows that Mr. Pena suffers from numerous

---

[46]*Id*. at pp. 27 & 29.

[47]*Id*. at pp. 29-30.

impairments: chronic liver disease treated by a liver transplant, diabetes mellitus with renal insufficiency, degenerative arthritis, obesity, hypertension, an adjustment disorder, and a learning disorder. Because Mr. Pena challenges only the determination that he was not disabled prior to that date, the evidence contained in the record for the time period February 1, 1997 to January 19, 1999 is relevant to this review. That evidence is very minimal and comes from (1) Atascosa Health Center, (2) Tri-City Hospital, and (3) testimony during Mr. Pena's hearing. Much of the testimony comes from Mr. Pena's wife. The record also contains four evaluations that were performed shortly after the relevant time period—these evaluations are relevant because the evaluators assessed Mr. Pena's capabilities during the relevant time frame.

Mr. Pena's records from Atascosa Health Center reflect the first signs of physical impairment, beginning in March 1996.[48] By that time, Mr. Pena had not worked for four years. Mr. Pena stopped working after Mrs. Pena asked him to stay home to take of the family household and the couple's three children.[49] Later, Mrs. Pena's health failed, requiring even more help from Mr. Pena. Ultimately, Mrs. Pena applied for, and was awarded, SSI and DIB.

Mrs. Pena testified that Mr. Pena started getting sick sometime in 1996, but the record does not reflect medical treatment until March 16, 1996. On that day, Mr. Pena was seen at the Atascosa Health Center, complaining about right leg pain.[50] The treatment notes for that day are difficult to read, but it appears that the treating physician advised Mr. Pena to use an ace wrap,

---

[48]*Id*. at p. 467.

[49]*Id*. at p. 640 (Mrs. Pena testified that she asked her husband to stop working in 1992 or 1993 because she started getting sick and needed Mr. Pena to take care of the kids).

[50]*Id*. at p. 467.

take Ibuprofen and to elevate his leg.  Mr. Pena returned to the clinic on December 2, 1996,

complaining again about right leg pain.[51]  These complaints appear to be the origin of Mr. Pena's

ultimate diagnosis of degenerative joint disease.[52]  Mr. Pena visited the clinic on a fairly regular

basis until September 1997 for routine checks for diabetes and high blood pressure.  During this

time period, he complained about pain in his left heel, swelling in his hands and feet, weakness

and fatigue in the evenings, numbness in his hands, and dizziness.[53]  Mr. Pena's physician treated

Mr. Pena's diabetes and high blood pressure, as well as these complaints, with a variety of

medications—Glucotrol, an oral hypoglycemic (lowering blood glucose levels) medicine used in

the treatment of diabetes mellitus;[54] Lotensin, used in the treatment of high blood pressure;[55]

triamterene, an oral diuretic;[56] and Ibuprofen, an anti-inflammation medicine.[57]  Many of Mr.

---

[51]*Id*. at p. 468.

[52]*Id*. at p. 288.

[53]*Id*. at p. 310 (left heel pain on May 1, 1997), p. 308 (right heel pain on May 30, 1997), p. 307 (weakness, dizziness, and blurred vision on Aug. 6, 1997), p. 306 (weakness, dizziness, blurred vision, swelling in hands and feet on Aug. 13, 1997), p. 303 (left leg pain and feeling tired on Sept. 4, 1997), 299 (numbness in right leg on Nov. 24, 1997), p. 299 (numbness in right leg and swelling in right hand), p. 298 (pain in right leg on Jan. 23, 1998), p. 297 (swelling in left leg and both hands, headache, and pain in right leg on Feb. 27, 1998), p. 295 (pain in both knees and fluid in feet on Apr. 24, 1998), p. 293 (pain in knees and weakness in evenings on May 8, 1998), p. 292 (numbness in fingertips of both hands on May 22, 1998), p. 290 (pain in right hip and numbness in right hand on July 27, 1998), p. 282 (pain in left hand, fingers getting numb, and problems with sleeping on Sept. 2, 1998), p. 280  (weakness and numbness in right hand on September 16, 1998), p. 274 (weakness, shakiness, and fatigue in evenings on November 20, 1998).

[54]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. G-2362 (Matthew Bender 2005).

[55]*Id*. at L-3864.

[56]*Id*. at TH-TY-263.

[57]*Id*. at I-77.

11

Pena's complaints during this treatment period are consistent with common side effects of taking Lotensin—*i.e.*, edema (swelling), headache, cough, dizziness, stomach upset, and fatigue.[58]

Mr. Pena continued to complain about right-leg pain until July 1998.  An X-ray taken of Mr. Pena's right hip on July 27, 1998 showed degenerative joint disease.[59] The record does not indicate that Mr. Pena's right-leg pain prevented him from working.  A blood sample collected on September 4, 1997 tested positive for hepatitis C.[60]  "Hepatitis C is a liver disease caused by the hepatitis C virus (HCV), which is found in the blood of persons who have this disease.  HCV is spread by contact with the blood of an infected person."[61]  The record does not indicate that Hepatitis C prevented Mr. Pena from working.  A sonogram[62] of Mr. Pena's liver on August 3, 1998 revealed that Mr. Pena's liver was normal.  These records support the ALJ's determination that Mr. Pena was not disabled during the time period February 1, 1997 to January 19, 1999 because they show that Mr. Pena's high blood pressure and diabetes were being treated on a regular basis and the records do not indicate a limitation that would have prevented Mr. Pena from performing light work.

Mr. Pena's records from Tri-City Community Hospital provide more evidence of Mr. Pena's impairments, but do not indicate that he could not work during the time period February

---

[58]*Id*. at  L-3868.

[59]SSA record, p. 288.

[60]*Id*. at p. 353.

[61]Centers for Disease Control & Prevention, http://www.cdc.gov/, click on Diseases & Conditions.

[62]A sonogram produces an "image obtained by ultrasonography."   J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. S-4483 (Matthew Bender 2005).

1, 1997 to January 19, 1999.  On September 28, 1998, Mr. Pena saw Dr. Komaranaha Ganeshappa.[63]  I was unable to confirm why Mr. Pena was referred to Dr. Ganeshappa, but Dr. Ganeshappa indicated that Mr. Pena had an abnormal liver function test.[64]  Dr. Ganeshappa learned during his initial examination that Mr. Pena drank a few beers every day.  Dr. Ganeshappa asked Mr. Pena to stop drinking for three months, so he could develop a plan for long term recovery.  Dr. Ganeshappa ordered a Hepatitis C quantitative test.   Mr. Pena returned on December 7, 98.  On that day, Dr. Ganeshappa reported that the Hepatitis C studies "came back at 162,000 which means that we need to consider doing a liver biopsy and put him on a course of treatment with Interferon . . . ."[65]  Interferon is a "substance, chemically a protein, formed in cells and tissues in response to infection with a virus.  It prevents reproduction of the virus and produces in other cells a state of resistance toward further infection with viruses."[66]  Although Mr. Pena's medical records do not contain a record of this treatment, Mrs. Pena testified that Mr. Pena used Interferon for only a week because he was allergic to the substance.[67]  On January 18, 1999, Mr. Pena told Dr. Ganeshappa that he stopped drinking and Dr. Ganeshappa sent Mr. Pena to get a liver biopsy.[68]  The liver biopsy showed fairly advanced

---

[63]SSA record, pp. 217, 278.

[64]*Id*.

[65]Id. at p. 216.

[66]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. I-2898 (Matthew Bender 2005).

[67]SSA record, p. 647.

[68]*Id*. at p. 232.

disease with what looked like early cirrhosis features along with active hepatitis,[69] including

"hepatocyte necrosis [dead liver cells]."[70]  These results formed the basis of the ALJ's disability

determination under section 5.05(F)(3).  The Tri-City Community Hospital records do not

contain any evidence that this condition or any other medical condition prevented Mr. Pena from

working prior to the liver biopsy.  Thus, the records support the ALJ's determination that Mr.

Pena was not disabled during the time period February 1, 1997 to January 19, 1999.

Apart from Mr. Pena's medical records, four evaluations support the ALJ's

determination: (1) a psychiatric evaluation by Dr. D.C. Manuel, (2) a psychiatric review

technique by Dr. Lyman G. Phillips, (3) a medical examination by Dr. Gerald Phillips, and (4) a

physical residual functional capacity assessment by Dr. James A. Gorman.  Dr. Manuel examined

Mr. Pena on February 6, 1999.[71]  Dr. Manuel diagnosed Mr. Pena as having depressive disorder

and a history of alcohol abuse in remission.  Dr. Manuel made a global assessment-of-

functioning (GAF)[72] rating of 55.  Under the GAF scale, a score of 55 falls midway within the

range for "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic

attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends,

---

[69]*Id*. at p. 215.

[70]*Id*. at p. 240.

[71]*Id*. at pp. 256-9.

[72]The global assessment of functioning (GAF) is a numeric scale (0 through 100) used by mental health clinicians and doctors to rate the social, occupational and psychological functioning of adults. *See* Am. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 27 (4th ed., text revision, 2000) (hereinafter DSM-IV-TR), at 32-36.  The scale is described in the DSM-IV-TR.  *See id.*

conflicts with peers or co-workers)."[73]  Dr. Manuel opined that Mr. Pena needed adequate

medication management of his depression and that once Mr. Pena's depression was under

control, Mr. Pena could be rehabilitated to work.[74]

On February 9, 1999, Dr. Gerald Phillips examined Mr. Pena at the request of the Texas

Rehabilitation Commission.[75]  Dr. Phillips determined that Mr. Pena had no major problems with

his diabetes, but that Mr. Pena's liver was infected by hepatitis.[76]  Dr. Phillips observed that

although Mr. Pena's obesity prevented a lot of motion from happening, Mr. Pena walked without

difficulty.  He also observed that although Mr. Pena complained about several sore joints, the

joints were functional and range of motion was good.  Dr. Phillips determined that Mr. Pena

could sit for long periods of time, but that he could stand for only 30-40 minutes at a time.  Dr.

Phillips found that Mr. Pena could handle small objects with both hands well.  Dr. Phillips also

determined that Mr. Pena could lift 50-80 pounds without difficulty.  Except for the opinion that

Mr. Pena could stand for only 30-40 minutes at a time, this assessment supports the ALJ's

determination that Mr. Pena could perform light work—lifting and carrying up to 20 pounds

occasionally and 10 pounds frequently; walking/standing up to 6 hours of a workday with normal

breaks; sitting up to 6 hours of a workday with normal breaks; and performing work involving

---

[73]DSM-IV-TR at 34.

[74]SSA record, p. 259.

[75]  The TRC's Disability Determination Services "adjudicates Social Security disability claims in accordance with the Social Security Act."  *See* TEX. SERVICES: SUPP. TO THE 2000 BIENNIAL REP., TEX., COUNCIL FOR DEVELOPMENTAL DISABILITIES ¶ 1.5.1 (May 2000), *available at* www.txddc.state.tx.us, click on resources & then on biennial reports.

[76]SSA record, pp. 261-4.

only simple, repetitive tasks—during the challenged time period because it shows that Mr. Pena

had the residual functional capacity to do light work.  The ALJ found that Dr. Phillips's opinion

that Mr. Pena could stand for 30-40 minutes was not supported by the other evidence in the

record.  The ALJ explained as follows:

> At the psychiatric examination 3 days prior to the physical examination, [Mr. Pena] said he walked and did some yard work.  He said that his mother lived a few blocks from were he lived, and 3 to 4 times a week he walked to her house to visit.  He has been encouraged to lose weight to help control his diabetes, but continues to be obese.  However, it does not significantly restrict his activities.[77]

The ALJ's finding is supported by the record.  Nothing else in Mr. Pena's medical records prior

to January 19, 1999 suggests that Mr. Pena could stand for only 30-40 minutes.  Although Mr.

Pena complains about this finding because most light work jobs require the ability to do more

walking and standing,[78] substantial evidence supports the ALJ's determination that Mr. Pena

could perform light work despite Dr. Phillips's opinion.

On March 8, 1999, Dr. Lyman G. Phillips reviewed Mr. Pena's medical records and

completed a psychiatric review technique form.  Dr. Phillips diagnosed Mr. Pena as having

depressive disorder, not otherwise specified, and a history of alcohol abuse.  Dr. Phillips

observed that Mr. Pena had never had a psychiatric hospitalization or treatment.  Dr. Phillips also

observed that Mr. Pena had deficiencies of concentration, persistence or pace resulting in the

failure to complete tasks in a timely manner, but opined that Mr. Pena's prognosis was fair with

---

[77]*Id*. at p. 27.

[78]*See* Titles II & VI: Determining Capability to Do Other Work—The Medical-Vocational Rules of Appendix 2, Social Security Ruling 83-10, *available at* 1983 WL 31251 ("Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing—the primary difference between sedentary and most light jobs.").

adequate medical management.  Dr. Phillips concluded that Mr. Pena's alleged limitations were

not supported by medical or other evidence in Mr. Pena's file.

Dr. Phillips also completed a mental residual functional capacity assessment.[79]  That form

asked the rater to assess several mental activities within the context of the claimant's capacity to

sustain that activity over a normal workday and workweek.  None of Dr. Phillips's ratings

indicated that Mr. Pena is unable to work.[80]  Dr. Phillips concluded that Mr. Pena retained the

mental residual functional capacity to perform simple tasks in routine work environment.  This

assessment supports the ALJ's determination that Mr. Pena could perform light work during the

---

[79]SSA record, pp. 200-03.

[80]Dr. Phillips made the following assessments: (1) not significantly limited in the ability to
remember locations and work-like procedures, (2) not significantly limited in the ability to
understand and remember very short and simple instructions, (3) moderately limited in the ability
to understand and remember detailed instructions, (4)  not significantly limited in the ability to carry
out very short and simple instructions, (5) moderately limited in the ability to carry out detailed
instructions, (6) moderately limited in the ability to maintain attention and concentration for
extended periods, (7) not significantly limited in the ability to perform activities within a schedule,
maintain regular attendance, and be punctual within customary tolerances, (8) not significantly
limited in the ability to sustain an ordinary routine without special supervision, (9) not significantly
limited in the ability to work in coordination or proximity to others without being distracted by them,
(10) not significantly limited in the ability to make simple work-related decisions, (11) not
significantly limited in the ability to complete a normal workday and workweek without interruptions
from psychologically based symptoms and to perform at a consistent pace without unreasonable
number and length of rest periods, (12) not significantly limited in the ability to interact appropriately
with the general public, (13) not significantly limited in the ability to ask simple questions or request
assistance, (14) not significantly limited in the ability to accept instructions and respond
appropriately to criticism from supervisors, (15) not significantly limited in the ability to get along
with coworkers or peers without distracting them or exhibiting behavioral extremes, (16) not
significantly limited in the ability to maintain socially appropriate behavior and to adhere to basic
standards of neatness and cleanliness, (17) not significantly limited in the ability to respond
appropriately to changes in the work setting, (18) not significantly limited in the ability to be aware
of normal hazards and take appropriate precautions, (19) not significantly limited in the ability to
travel in unfamiliar places or use public transportation, and (20)  not significantly limited in the
ability to set realistic goals or make plans independently of others.  SSA record, pp. 200-01.

challenged time period because it indicates that Mr. Pena was limited only in his ability to understand, remember, and carry out detailed instructions and to maintain attention and concentration for extended periods of time.

Dr. James Gorman also reviewed Mr. Pena's medical records on March 8, 1999.[81]  Dr. Gorman completed a physical residual functional capacity form.  Dr. Gorman determined that Mr. Pena's medical records established no exertional limitations, no postural limitations, no liver problems, no manipulative limitations, no visual limitations, and no communicative or environmental limitations.  Dr. Gorman opined that the severity or duration of Mr. Pena's symptoms was disproportionate to the expected severity or expected duration on the basis of Mr. Pena's medically determinable impairments.[82]  Dr. Gorman concluded that Mr. Pena's alleged limitations were not supported by medical or other evidence.  This assessment supports the ALJ's determination that Mr. Pena could perform light work during the challenged time period because it indicates that Mr. Pena had no physical limitation that prevented him from working.

In addition to these evaluations, Dr. Arthur Briggs testified during Mr. Pena's first hearing that nothing in Mr. Pena's medical records showed that Mr. Pena's liver problem met section 5.05(F)(3) of the Commissioner's medical listings prior to Mr. Pena's liver biopsy.[83]  Dr. Briggs explained that Mr. Pena had experienced some degenerative changes in his right hip and left knee, but no evidence indicated that Mr. Pena met or equaled a listing during the challenged time period.  Dr. Briggs opined that prior to liver biopsy, Mr. Pena could have lifted and carried

---

[81]SSA record, pp. 246-51.

[82]*Id*. at p. 251.

[83]*Id*. at p. 652.

10 pounds frequently and 20 pounds occasionally and could have performed at least light work.[84] This assessment supports the ALJ's determination that Mr. Pena could perform light work during the challenged time period because it indicates that Mr. Pena had no physical limitation that prevented him from working.

This evidence—Atascosa Health Center records, Tri-City Hospital records, Dr. Manuel's psychiatric evaluation, Dr. Lyman Phillips's psychiatric review technique, Dr. Gerald Phillips's medical examination, Dr. Gorman's physical residual functional capacity assessment, and Dr. Briggs's testimony—constitutes substantial evidence that supports the ALJ's determination that Mr. Pena was not disabled prior to January 20, 1999.  With the exception of Dr. Phillips's opinion that Mr. Pena could stand for only 30-40 minutes, this evidence indicates that Mr. Pena could perform light work.  The only contrary evidence is Mrs. Pena's testimony.

During the first hearing, Mrs. Pena testified that Mr. Pena started getting sick in 1996.[85] She explained that Mr. Pena's biggest problem was that Mr. Pena was depressed and his leg hurt.[86]  At the conclusion of the hearing, the ALJ told Mr. Pena that he was going to recommend the award of benefits beginning on the date of his liver biopsy and asked Mr. Pena if he would like to amend his alleged onset date.  Mrs. Pena answered "no" and explained that she knew Mr. Pena was disabled prior to June 1997 because she lived with Mr. Pena.[87]  During the second hearing, Mrs. Pena testified that Mr. Pena experienced leg pain, weakness and dizziness during

---

[84]*Id*. at p. 654.

[85]*Id*. at p. 640.

[86]*Id*. at p. 644.

[87]*Id*. at p. 659.

the challenged time period.  She stated that Mr. Pena could not get up one morning in 1996 because his legs were hurting so bad.  She also stated that Mr. Pena complained about soreness and aching in his hands.  She also testified that Mr. Pena did not sleep well and that he was depressed.  Mrs. Pena's testimony about Mr. Pena's ailments during the challenged time period are consistent with Mr. Pena's medical records, but Mrs. Pena's assertion that Mr. Pena was disabled prior to June 1997 is insufficient to overcome the contrary medical evidence.

Mr. Pena's primary argument focuses on the ALJ's application of grid rules.  Mr. Pena argues that the ALJ should have applied rule 201.09 or rule 202.09.  The SSA applies the grid rules, or Medical-Vocational Guidelines,[88] in cases where a claimant is not doing substantial gainful activity and is prevented by a severe medically determinable impairment from doing vocationally relevant past work.[89]  The grid rules use data reflecting major functional and vocational patterns taken from the Dictionary of Occupational Titles.[90]  Each rule uses four factors—exertional level, age, education, and previous work—to reach a disability decision.  The Commissioner must first determine which rule correlates to the claimant's exertional limitations, age, education and prior work experience.[91]  "If that rule dictates a finding that the claimant is disabled, then eligibility for disability benefits is established. . . . However, if the applicable rule directs a finding that plaintiff is not disabled, then, only, must the Commissioner consider

---

[88]20 C.F.R. pt. 404, subpt. P, appx. 2.

[89]20 C.F.R. § 404.1569.

[90]*Id.*

[91]*Rodriguez v. Barnhart*, No. SA-05-CA-1203, 2006 WL 3779777 (W.D. Tex. Nov. 6, 2006), at * 2.

nonexertional limitations and utilize the testimony of a vocational expert."[92]

Mr. Pena first maintains that the ALJ should have applied rule 201.09 which applies to sedentary work.  Mr. Pena contends that the ALJ erred by rejecting Dr. Phillips's opinion that he could stand for only 30-40 minutes and by applying rule 202.11, a rule that applies to light work. Mr. Pena argues that had the ALJ accepted Dr. Phillips's opinion, rule 202.09 would have required a determination of disability.  As discussed above, the ALJ's determination that Mr. Pena could do light work during the challenged time period is supported by substantial evidence. Nothing in Mr. Pena's medical records indicates that he could stand for only 30-40 minutes.

In the alternative, Mr. Pena argues that the ALJ misapplied the rules that apply to light work because the ALJ found that Mr. Pena is not illiterate.  The ALJ applied rule 202.11 which applies to a person of "closely advancing age" who has a limited or less education, whose previous work was skilled or semi-skilled and whose skills are not transferrable.  The ALJ rejected rule 202.09 because Mr. Pena has a sixth grade education and because a vocational expert testified that Mr. Pena's previous job as a heavy machine operator was semiskilled work.  Rule 202.09 applies to a person of "closely advancing age" who is "illiterate or unable to communicate in English" and whose previous work experience was unskilled.   Under the SSA regulations, "[i]lliteracy means the inability to read or write."[93]  The SSA considers "someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name."[94]  In finding that Mr. Pena is not illiterate, the ALJ rejected

---

[92]*Id.*

[93]20 C.F.R. § 404.1564(b)(1).

[94]*Id.*

Dr. Susan G. Pelzer's opinion that Mr. Pena was functionally illiterate.

Dr. Pelzer examined Mr. Pena on April 10, 2003.  Dr. Pelzer administered the Wechsler Adult Intelligence Scale - Third Edition and reported that Mr. Pena scored as follows: verbal IQ - 70, performance IQ - 65, and full scale - 65.[95]  For academic achievement, Mr. Pena scored at first grade level in reading, first grade level in spelling, and fourth grade level in arithmetic.[96]  The ALJ specifically rejected Mrs. Pena's assertion that Mr. Pena shopped by matching the words on a list with the words on the items in the store.  The ALJ found this assertion to be absurd based on the amount of time it would take to compare the spelling of the words on a list with the words on the labels of every item in a store.

Instead of illiterate, the ALJ determined that Mr. Pena has a marginal education and has difficulty reading and writing, but that he is not illiterate.[97]  This finding is supported by substantial evidence.  "Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs.  The SSA "generally consider[s] that formal schooling at a 6th grade level or less is a marginal education."[98]  On February 15, 1997, Mr. Pena reported on a disability report that he completed the sixth grade.[99] Mr. Pena reported to Dr. Pelzer that he dropped out of school in the fifth or sixth grade and that he reads the

---

[95]SSA record, p. 474.

[96]*Id*. at p. 474.

[97]*Id*. at p. 30.

[98]20 C.F.R. § 404.1564(b)(2).

[99]SSA record, p. 99.

newspaper, skipping over words that he doesn't know.[100]  During the first hearing, Mr. Pena

testified that he completed the sixth grade and that he can read and write a little.[101]  Mrs. Pena

testified that Mr. Pena completed the sixth or seventh grade[102] and that Mr. Pena can read and

write a little bit.[103]  On January 11, 1999, Mrs. Pena completed a supplemental questionnaire for

Mr. Pena and wrote at the end of the form, "I wrote what he said. . . . [H]e can't read or write very

well."[104]  Mr. Pena is fluent in English.[105]  This evidence supports a finding that Mr. Pena has a

marginal education, but not that he is unable to read and write.  Thus, the evidence shows that rule

202.11 applies — the rule that applies to a claimant whose age is closely approaching advanced

age, who has limited or less education, and has a past work history of skilled or semi-skilled work

without skills that are transferrable.  Rule 202.11 directs a finding of "not disabled."  Because the

application of the rule resulted in a finding of "not disabled," the ALJ was required to consider

nonexertional limitations and use the testimony of a vocational expert.

At this point, the ALJ posed a hypothetical question to a vocational expert to consider the

effect of Mr. Pena's nonexertional limitations—moderate problems in concentration, persistence

and pace that would limit the person to unskilled work, simple repetitive tasks.[106]  The vocational

---

[100]*Id.* at p. 473.

[101]*Id.* at p. 646.

[102]*Id.* at p. 645.

[103]*Id.* at p. 655.

[104]*Id.* at p. 107.

[105]*Id.* at p. 473.

[106]*Id.* at pp. 625-6.  The ALJ's question follows:

expert responded with a list of jobs that a person with those limitations could preformed.  The

ALJ then posed a second hypothetical question to determine whether limited education and

difficulty with reading would prevent a person from performing those jobs.[107]  The vocational

expert answered that, "It wouldn't have any significant impact at all."[108]  This process shows that

the ALJ properly applied the grid rules.

## VI. **Recommendation**

The ALJ's finding that Mr. Pena is not illiterate is supported by substantial evidence.  The

ALJ's determination that Mr. Pena could perform light work prior to January 20, 1999 is

supported by substantial evidence.  The ALJ properly applied the grid rules.  Consequently, I

conclude that substantial evidence supports the ALJ's determination that Mr. Pena was not

disabled prior to January 20, 1999.  I recommend that Mr. Pena's request for relief (docket entry #

---

I would like you to assume a person who had a 6th grade education, past relevant work as a janitor and heavy machine operator and also the dump truck operator and construction worker.  And I would like you to assume that this person is limited to light work with a lifting restriction of 10 pounds frequently, 20 occasionally.  And I would like you to assume that this person has moderate problems with concentration, persistence pace that would limit this person to unskilled work simple, repetitive tasks.  Can you give me examples of light, unskilled jobs that would fit that profile.

*Id*.

[107]*Id*. at p. 627.  The ALJ's question follows:

Let me ask you to assume that a person had a 1st grade reading level and a 4th grade math level on testing.  How, if at all, would that effect the ability to do the cannery worker, vehicle cleaner, poultry processor, hand packager, light cleaner jobs?

*Id*.

[108]*Id*. at p. 627.

1) be DENIED and that the Commissioner's decision denying Mr. Pena benefits prior to January 20, 1999 be AFFIRMED.

### VII. Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this Memorandum and Recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "Filing User" with the Clerk of Court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.  Written objections to this Memorandum and Recommendation must be filed within 10 days after being served with a copy of same, unless this time period is modified by the District Court.[109]  **Such party shall file the objections with the Clerk of the Court, and serve the objections on all other parties and the Magistrate Judge.**  A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the District Court need not consider frivolous, conclusive or general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the District Court.[110]  Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this Memorandum and Recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed

---

[109]28 U.S.C. §636(b)(1); FED. R. CIV. P. 72(b).

[110]*Thomas v. Arn*, 474 U.S. 140, 149-152 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000).

factual findings and legal conclusions accepted by the District Court.[111]

    **SIGNED** on May 1, 2007.

<br>

NANCY STEIN NOWAK
UNITED STATES MAGISTRATE JUDGE

---

[111]*Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).